#068346

ORIGINAL

FILED
JUL 10 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION LIFT, INC. | : | |
| Plaintiff, | : | |
| v. | : | No. 08-500 C |
| | : | JUDGE |
| THE UNITED STATES | : | |
| Defendant. | : | |

## COMPLAINT

## I PARTIES

1. Plaintiff is Precision Lift, Inc. ("PLI") is a corporation organized and existing pursuant to the laws of the State of Montana, with its principal place of business in Seneca South Carolina.

2. Defendant is the United States of America acting through the Army National Guard Bureau ("ARNGB").

## II JURISDICTION

3. Jurisdiction is founded on 28 U.S.C. § 1491(b) in that this is an action challenging the award of a contract.

## III BACKGROUND

4. PLI has been in operation since May of 1990; it was originally incorporated in the State of Virginia, the Virginia Corporation was dissolved and PLI was then incorporated in the State of Montana in 1999.

5. Since October, 2005 John Tollenaere has been the sole stockholder in PLI, and through him PLI has been certified by SBA as a Viet Nam Era Service Disabled Veteran-Owned Small Business ("SDVOSB"); PLI is also a Small Business Administration certified HUBZone Small Business Concern.

6. In 2001 PLI began working with a Canadian company, West Coast Weld Tech, Inc. ("WCWTI"), which was a manufacturer of helicopter maintenance platforms.

7. In 1998, PLI had been awarded a General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract for Heli-Baskets, i.e., Contract No. GS-07F-9893H; in 2001, as a result of PLI's new relationship with WCWTI, helicopter maintenance platforms were added to PLI's GSA FSS contract.

7. Because GSA contracts contain a NAFTA clause (FAR 52.225-21 or 52.225-21), the contractor is permitted to supply Canadian manufactured products, as if they were domestic.

8. Subsequently, PLI and WCWTI discussed the establishment of an American manufacturing facility, so as to be able to compete for maintenance platform contracts outside of PLI's FSS contract (i.e., contracts without the NAFTA clause).

9. As a result, in 2005 WCWTI established West Coast Weld Tech International ("WCWT Int'l") at 4101 North Star Blvd., Great Falls Montana.

10. Since 1984, PLI and WCWTI/WCWTI, Int'l have delivered 35 UH-60 helicopter maintenance platforms, 15 CH-47 helicopter maintenance platforms and 7 AH-64 helicopter maintenance platforms to various U.S. Military department, including 6 CH-47, 63 UH-60 and 5 UH-60 (Tail Section) platforms to the Army National Guard Bureau ("ARNGB") under Contract W9133L-05-F-0218 awarded in 2005 ("Contract 0218").

11. In August of 2007, PLI became aware of a new procurement being conducted by the ARNGB for maintenance platforms for various helicopters.

12. Solicitation W9133L-07-T-0033 ("the Solicitation") was issued by the ARNGB in August 6, 2007; it sought competitive proposals for maintenance platforms for CH-47, UH-60 and AH-64 helicopters.

13. The Solicitation also included a three page "Performance Specification" (see Exhibit "A" pages 3-5) for "Portable Aircraft Maintenance Platforms."

14. The Performance Specification included, under "Definitions," what were described as "Minimum Performance Standards (MPS)," which were stated to be. "Mandatory capabilities that are required to be offered in the candidate platform," and which, "shall not be traded against other...requirements...." (emphasis in original)

15. According to the Performance Specification, one "Minimum Performance Standard" for the offered platforms was that they be "commercial; non-developmental items."

16. The Solicitation further provided that award would be made on a "best value" basis with three evaluation factors (in descending order of importance): Technical, Past Performance and Price.

17. Per Amendment 001to the Solicitation, the title of the Performance Specification was changed to "Phase Maintenance Platforms

18. In addition to the change in the title of the Performance Specification, there were several changes to the platforms described therein.

19. The original language in the performance specification clearly described a portable or universal type of platform, i.e., a small, easily transportable platform, akin to scaffolding on wheels; for example

a) the platforms had to be towable with a standard aircraft tow-bar

b) the platforms had to fit on a military 463L pallet (88" by 108") when disassembled;

c) the platforms had to provide for "smooth towing," for use on soft, unimproved surfaces and for a level work surface when on an up to 10 degree slope.

20. The revised Performance Specification, per Amendment 001 stated that the platforms were to be "Phase Maintenance Platforms," which are different from simple portable platforms; the term "phase maintenance platform" describes a platform which would encircle the entire helicopter, and one which has multiple, vertically-adjustable decks, multiple access stairs, is able to support safely an entire maintenance team working on different areas of the aircraft simultaneously, is designed for an exact fit to a specific aircraft, and comes equipped with integrated electrical, lighting and pneumatic utilities, essentially creating a fixed work environment around an aircraft.

21. Notwithstanding Amendment 001's change in the items being procured, language remained in the specification that was inconsistent with "phase maintenance platforms," e.g., the requirement for towability, which does not apply to a "phase maintenance platform," and the requirement for use on an up to 10 degree slope.

22. As a result of Amendment 001's apparent change in the type of items being procured, while keeping the same basic description and still requiring that the offered platforms be "commercial, non-developmental item(s)," PLI sent a question to the

ARNGB Contracting Officer: "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?"

23. Amendment 002 to the Solicitation was then issued on August 22, 2007 by the ARNGB; it modified the Performance Specification; the requirement for a "commercial, non-developmental item" remained, however

24. Amendment 002 also included the following Answer To Questions (i.e., the answer to PLI's question:

> 1. "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?" YES

25. PLI submitted a timely offer in response to the Solicitation.

26 In its offer, PLI set forth its background, including listings the contracts for helicopter maintenance platforms; in total PLI delivered some 200 units of various types of platforms to the Military.

27. On September 23, 2007, PLI became aware of a story in a Montana newspaper; in it, Spika Welding & Manufacturing, Inc. ("Spika") announcement that it had been awarded the contract arising from the Solicitation.

28. PLI immediately called the Contracting Officer and on the day, PLI received a memorandum informing it of the award to Spika; PLI saw on the memorandum that Spika's price was higher then that which PLI had offered.

29. PLI is familiar with Spika, since that firm had been a subcontractor to PLI under Contract 0218 with the ARNGB, a contract which included both helicopter maintenance platforms and trailers; while Spika manufactured the trailers, the maintenance platforms were produced by WCWTI/ WCWT Int'l.

30 While as of the date of offers to the ARNGB Spika had recently begun to produce simple platforms, it had never manufactured and put into use any "Phase Maintenance Platforms" of the type described in the Performance Specification.

31. PLI immediately requested a debriefing from the Contracting Officer, which PLI received on October 1, 2007.

32. At that point, PLI filed a protest with the Government Accountability Office ("GAO"), asserting, among other things, that platforms offered by Spika did not meet the requirement for a "commercial, non-developmental item."

33. The ARNGB had responded to the protest, in part, by asserting that Spika had, in fact, produced the very same maintenance platforms as were being procured under the Solicitation, as subcontractor to PLI under Contract 0218.

34 PLI then submitted to GAO a sworn declaration from its President, attesting to the fact that under Contract 0218 Spika had only produced the trailers and had never produced any of the maintenance platforms.

35. At that point, PLI was notified by the ARNGB that it would reevaluate the offers, specifically researching the issue of whether Spika had offered "commercial non-developmental items."

36. On March 31, 2008 PLI received via e-mail a letter from the new Contracting Officer confirming the award to Spika.

37. PLI again requested a debriefing

38. PLI filed a second GAO protest on April 8, 2008.

39. PLI's second protest again argued, among other things, that Spika's platforms did not meet the requirement in the Performance Specification for a "commercial, non-developmental item," because Spika had never previously produced any of the platforms being procured.

40. The ARNGB report to the GAO asserted that the platforms offered by Spika were commercial items, because they were platforms Spika had produced previously with "minor modifications."

41. PLI responded and again asserted that Spika had never previously produced platforms of the types described in the Performance Specification.

42. At GAO's request the ARNGB attorney contacted Spika and confirmed that Spika had not previously manufactured platforms of this type; however, the attorney now asserted that Spika's platforms were still acceptable as "commercial items" under the Performance Specification because Spika had circulated marketing brochures to potential customers and such circulation of marketing brochures constituted offers to sell the platforms.

43. Ultimately, the GAO denied PLI's protest; while the redacted version of the decision has yet to be released, the GAO ruled that Spika's platforms met the definition of "commercial, non-developmental items" in the FAR 2.101 (i.e., offered for sale to the general public) and thereby the Performance Specification, because, while Spika had not actually sold any such platforms, it had circulated marketing brochures to potential customers, and that, according to the GAO, meant they had been "offered for sale to the general public."

**COUNT I**
**DECLARATORY RELIEF**

44. PLI hereby incorporates paragraphs 1 through 43 of this Complaint as if set forth in full.

45. PLI respectfully requests that the Court declare that the ARNGB's award of the Contract arising from the Solicitation to Spika to have been arbitrary and capricious and thus contrary to law, in that:

a) it was based on an erroneous belief on the part of ARNGB contracting personnel that Spika had previously produced platforms of this type; and

b) Spika's offered platforms do not comply with the requirements for "commercial non-developmental items" set forth in the Performance Specification.

**COUNT II**
**INJUNCTIVE RELIEF**

46. PLI hereby incorporates paragraphs 1 though 45 of this Complaint as if set forth in full.

47. PLI respectfully requests that the Court permanently enjoin performance of the contract awarded by the ARNGB arising from the Solicitation.

Respectfully Submitted,

Marc Lamer

---------------------------------------

Marc Lamer
Attorney for Precision Lift, Inc.