ORIGINAL

FILED
JUL 10 2008
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **PRECISION LIFT, INC.** | : | |
| **Plaintiff,** | : | **No. 08-500 C** |
| **v.** | : | **JUDGE** |
| **THE UNITED STATES** | : | |
| **Defendant.** | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The instant action is brought by Plaintiff, Precision Lift, Inc. ("PLI" or "Plaintiff") under the Court's "bid protest" jurisdiction. See 28 U.S.C. § 1491(b). The matter is currently before the Court on PLI's Motion for a Temporary Restraining Order and Preliminary Injunction.

Essentially, PLI is challenging the decision by the U.S. Army National Guard Bureau ("ARNGB") to award the contract under the Solicitation W9133L-07-R-0033 ("the Solicitation") to an offeror whose offered products do not meet the terms of the Solicitation. PLI seeks a declaratory and injunctive relief, on the basis that the award decision by the ARNGB is arbitrary and capricious and lacking a rational basis.

## II. STATEMENT OF FACTS[1]

PLI has been in operation since May of 1990; it was originally incorporated in the State of Virginia, the Virginia Corporation was dissolved and PLI was then incorporated in the State of Montana in 1999.

In 2001 PLI began working with a Canadian company, West Coast Weld Tech, Inc. ("WCWTI"), which was a manufacturer of helicopter maintenance platforms. In 1998, PLI had been awarded a General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract for Heli-Baskets, i.e., Contract No. GS-07F-9893H; in 2001, as a result of PLI's new relationship with WCWTI, helicopter maintenance platforms were added to PLI's GSA FSS contract. Because GSA contracts contain a NAFTA clause (FAR 52.225-21 or 52.225-21), the contractor is permitted to supply Canadian manufactured products, as if they were domestic. Thus, PLI began working with WCWTI.

Subsequently, PLI and WCWTI discussed the establishment of an American manufacturing facility, so as to be able to compete for maintenance platform contracts outside of PLI's FSS contract (i.e., contracts without the NAFTA clause). As a result, in 2005 WCWTI established West Coast Weld Tech International ("WCWT Int'l") at 4101 North Star Blvd., Great Falls Montana. Since 2004, PLI and WCWTI/WCWTI, Int'l have delivered THIRTY-FIVE (35) UH-60 helicopter maintenance platforms, FIFTEEN (15) CH-47 helicopter maintenance platforms and SEVEN (7) AH-64 helicopter maintenance platforms to various U.S. Military department, including 6 AH-47, 63 UH-60 and 5 UH-60 (Tail Section) platforms to the Army National Guard Bureau ("ARNGB") under Contract W9133L-05-F-0218 awarded in 2005 ("Contract 0218").

---

[1] This Statement of Facts is taken for the declarations of Plaintiff's President, John Tollenaere

In August of 2007, PLI became aware of a new procurement being conducted by the ARNGB for maintenance platforms for various helicopters. Solicitation W9133L-07-T-0033 ("the Solicitation") was issued by the ARNGB in August 6, 2007; it sought competitive proposals for maintenance platforms for CH-47, UH-60 and AH-64 helicopters. The Solicitation also included a three page "Performance Specification," referencing, "Portable Aircraft Maintenance Platforms." The Performance Specification described a fairly simple sort of scaffolding, with requirements such easy towability and the ability to be used on an up to 10 degree slope. The Solicitation further provided that award would be made on a "best value" basis, with three evaluation factors (in descending order of importance): Technical, Past Performance and Price. The Performance Specification included under definitions the term "Minimum Performance Standards (MPS),: defined as :Mandatory capabilities that are required to be offered in the candidate platform," and which "shall not be traded against other…requirements." (emphasis in original).

Per Amendment 001to the Solicitation, the title of the Performance Specification was changed to "Phase Maintenance Platforms." While several of the characteristics from the original version remained, easy towability, for example, the platforms described were different. For one thing, the term "phase maintenance platform" is understood to mean a platform that wraps around the aircraft and can support an entire maintenance team. Additionally, the platforms were now required to have integrated pneumatic, lighting and electrical utilities.

The changes (and non-changes) in the Performance Specification, together with the mandatory requirement for a "commercial, non-developmental item," caused PLI to

submit a question to the ARNGB Contracting Officer: "Are you referencing previously designed and in use full wrap around phase/depot level maintenance stands?" Amendment 002 to the Solicitation was issued on August 22, 2007; it modified the Performance Specification. Amendment 002 also included the following Answer To Questions (which, clearly, was a response to PLI's question):

1. "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?" YES

PLI submitted a timely offer in response to the Solicitation. In its offer, PLI set forth its background, including listings the contracts for the various helicopter maintenance platforms delivered to the Military. On September 23, 2007, PLI became aware of a story in a Montana newspaper; in it, Spika Welding & Manufacturing, Inc. ("Spika") announcement that it had been awarded the contract arising from the Solicitation.PLI immediately contacted the ARNGB Contracting Officer and on the day, PLI received a memorandum informing it of the award to Spika; PLI immediately saw on the memorandum that Spika's price was higher than that which PLI had offered.

PLI is familiar with Spika, since that firm had been a subcontractor to PLI on Contract 0218, which was for helicopter maintenance platforms and trailers. Spika was the manufacturer of the trailers, while the maintenance platforms were produced by WCWTI and WCWT Int'l. While Spika has produced simple platforms, it has never produced anything like the platforms contemplated in the Performance Specification

PLI requested a debriefing, which it received on October 1, 2007. Following the debriefing, PLI filed a protest with the Government Accountability Office ("GAO") Among the issues PLI raised in the protest, it contended that platforms offered by Spika did not meet the Performance Specification's requirement for a "commercial, non-

developmental item, because Spika had not previously produced the platforms called for in the Solicitation.

The ARNGB responded to the protest, in part, by asserting that Spika had produced the very same maintenance platforms as subcontractor to PLI under its previous ARNGB contract. PLI then replied, including the submission of a sworn declaration from its President, attesting to the fact that Spika had only produced trailers under PLI's earlier contract, and that Spika had never produced any maintenance platforms of the type being procured under the solicitation. At that point, PLI was notified by the NGB that it would reevaluate the offers specifically researching the issue of whether Spika had offered "commercial non-developmental items."

On March 31, 2008 PLI received via e-mail a letter from the new Contracting Officer confirming the award to Spika. PLI filed a second GAO protest on April 8, 2008. PLI's second protest again argued, among other things that Spika's platforms did not meet the requirement in the Performance Specification for a "commercial, non-developmental item."

PLI received a written debriefing on April 11, in which the Contracting Officer asserted that Spika's platforms met the Performance Specification's requirement for a "commercial non-developmental item," because they were "commercial items with minor modifications from commercial platform designs." The ARNGB made the same argument to GAO, asserting that what Spika was offering was simply its "previously-supplied" platforms with minor modifications The basis for the assertion that Spika's platforms were simply modified versions of platforms it had supplied in the past was a letter Spika had provided after PLI's initial protest.

In its response to the ARNGB report to the GAO, PLI challenged the interpretation of the Spika letter offered by the Contracting officer , noting that it never actually said that Spika had manufactured the platforms previously. At that point the GAO attorney directed the ARNGB attorney to determine, once and for all, if Spika had previously produced platforms of this nature.

The ARNGB attorney acknowledged after conferring with Spika that Spika had not, in fact, produced platforms of this nature previously. However, the attorney argued, that Spika's platforms still met the requirement for a "commercial, non-developmental item" in the Performance Specification, because Spika had previously offered the platforms it was offering the ARNGB for sale to the general public (see FAR 2.101) by circulating marketing brochures to potential customers.

PLI responded by arguing that "offering" a produce "for sale" requires more than the mere circulation of introductory brochures, and, in any event, the Amendment 002 question and answer made clear that in this instance the ARNGB was clearly requiring offerors to propose platforms which had been, "previously designed and in use." Finally, PLI pointed out that the ARNGB attorneys were advancing an argument for the acceptability of Spika's platforms that was not the basis on which the Contracting officer had to award to Spika (at a higher price), i.e. that Spika was offering platforms that it had produced previously, but with only minor modifications. Ultimately, the GAO denied PLI's protest; while the redacted version of the decision has yet to be released, PLI's counsel has informed me that the GAO held that Spika's platforms met the definition of "commercial, non-developmental items" in the Performance Specification, because they

had been "offered for sale" to the general public, even though Spika had not, in fact, sold any.

## III. LEGAL ANALYSIS

### A. General Principles

In order to obtain a temporary restraining order, the plaintiff must show: (i) it will suffer irreparable injury unless the order issues; (ii) the threatened injury to the moving party outweighs any damage to the opposing party; (iii) the temporary restraining order, if issued, will not be adverse to the public interest; and (iv) a substantial likelihood exists that the moving party will prevail on the merits. See, e.g., OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001). A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice an Procedure § 2948 129-30 (2d ed. 1995)); see also Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997) (citing Golden Eagle Refining Co. v. United States, 4 Cl. Ct. 622, 624 (1984)).

### B. Irreparable Injury

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993); see also PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003). PLI asserts that it will suffer irreparable harm if the temporary restraining order is not granted, since award of a contract will render PLI's Size Appeal moot,[2] and the only other available relief – primarily, the potential for

---

[2] See, e.g., Size Appeal of Food Engineering Laboratories, Inc., SBA No. SIZ-2003-08-07-46 at 2 (2003); Size Appeal Of Hanel Storage Systems, L.P., SBA No. SIZ-98-10-26-45 at 2 (1998).

recovery of bid preparation costs – would not compensate PLI for its loss of valuable business. The latter form potential economic loss has been found sufficient to prove irreparable harm, see Norfolk Dredging Co. v. United States, 2003 WL-221416757 at 17 (Fed. Cl. 2003); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998), Bean Dredging Corp. v. United States, 22 Cl. Ct. 524 (1991).

### C. The Public Interest

Plaintiff needs no extensive argument as to the public interest. It was the lowest-priced offeror remaining in the competition for the helicopter maintenance platforms, items which PLI has successfully produced in the recent past. It is in the public interest that agencies evaluate offers fairly; the procurement process is compromised whenever an agency abuses its discretion in such evaluations. See, e.g., PGBA, LLC v United States, 57 Fed. Cl. 655, 664 (2003), Cincom Systems, Inc. v United States, 37 Fed. Cl. 266, 269 (1997).

### D. Lack of Harm to Other Parties

As strange as this may seem, the Solicitation did not included a delivery schedule for offerors. Nor did it require that offerors propose one. Thus, it would appear that Spika is free to deliver platforms whenever it chooses and that is acceptable to the ARNGB. Thus a brief delay while the Court considers PLI's Complaint would seem to have little effect on the ARNGB.

### E. Plaintiff Has Shown A Strong Likelihood Of Success On the Merits

The Court reviews challenges to agency actions described in § 1491(b)(1) according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§

701-706 ("APA"). 28 U.S.C. 1491(b)(4). Under the APA, the reviewing court may only overturn an agency action if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)(200). Cardinal Maintenance Service, Inc. v. United States, 63 Fed. Cl. 98,105 (2004). The Supreme Court had identified four grounds that constitute arbitrary and capricious agency action:

> Normally, an agency [action] would be arbitrary and capricious If the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. States Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Spherix, Inc. v. United States, 62 Fed. Cl. 497,504 (2004).

PLI would refer the Court to the GAO's decision in Avtron Manufacturing, Inc., B-280758, November 16, 1998, 98-2 CPD ¶ 148. Therein GAO stated that a requirement for a "commercial NDI [Non Developmental Item] test stand" would allow an offeror to propose either a "commercial" or a "non-developmental" item. In denying a protest that the awardee had not offered a compliant item, the GAO stated:

> To support its claims that its proposed test stand was market proven with a reliability track record. ACL, as requested by the RFP, provided performance specifications, a commercial specification sheet, a commercial manual, and lists of commercial customers for its CSD/IDG/GEN test stands, including the [DELETED] offered here. Id. at v. 1, § 3, and v.2.

Id. at page 5 (emphasis supplied). In the instant situation, Spika offered nothing with its proposal to the ARNGB, and only when asked directly by the ARNGB attorney, produced several "marketing brochures."

PLI has would also citethe GAO's decision in Chant Engineering Company, Inc., B-281521, February 22, 1999, 99-1 CPD ¶ 45. Therein the protester challenged its exclusion from a competition for commercial test stands. In denying the protest, GAO stated:

> Instant procurement, clearly does not satisfy the RFP requirement Although Chant's proposal showed that Chant had designed and fabricated several other types of test stations/stands for the government, there is no indication in the proposal that these items were ever commercially available and that the test station proposed here has evolved from any of those items through advances in technology or performance and would be available in the commercial marketplace in time to satisfy the delivery requirements of this RFP. See FAR § 52.202-1(c)(2). One of the purposes of a solicitation requirement for a commercial product is to avoid the design and engineering risks associated with new equipment by procuring a commercially proven items. See AUL Instruments, Inc., B-186319, Sept. 1, 1976, 76-2 CPD ¶ 212 at 6. New equipment like Chant's proposed test station,
>
> Which may only become commercially available as a result of the for commercial off-the-shelf (existing) equipment. See Aydin Corp., B-224185, Nov. 28, 1986, 86-2 CPD ¶ 625 at 3, aff'd B-224185.2, Feb. 10, 1987, 87-1 CPD ¶ 141, recon. denied, B-224185.3, Aug. 25, 1989, 89-2 CPD ¶ 176; AUL Instruments, Inc. supra.

Id. At page 4. PLI submits that the instant situation is precisely the same as was the case in Chant Engineering. Spika may have previously produced some type of maintenance stands, just as Chant Engineering had previously produced test stands. It may also have circulated "introductory" information to potential customers. However, Spika never produced the platforms being procured in the Solicitation. As such, Spika's

platforms did not meet the mandatory requirement of the Performance Specification for a "commercial, non-developmental item."

In deciding that Spika's platforms did, in fact, meet the requirement in the Performance Specification, GAO relied on FAR 2.101. That section of the FAR defines "commercial item" as follows (in pertinent part):

> "Commercial item" means—
>
> (1) Any item, other than real property, that is of a type customarily used by the general public or non-governmental entities for purposes other than governmental purposes, and—
>
> (i) Has been sold, leased, or licensed to the general public;
>
> (ii) Has been offered for sale, lease, or license to the general Public;
>
> (2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

Agency Counsel contended, and the GAO agreed, that Spika's platforms met this definition because they had been "offered for sale" to several entities. Agency Counsel cited "offers" to the Army Missile Command (AMCOM) on February 28, 2007 and the Army National Guard on March 29, 2007, as well as sales brochures that were distributed to numerous commercial and military customers. With respect to AMCOM and the Army National Guard, PLI would submit that these agencies cannot reasonably be considered a part of the "general public."[3] That leaves the commercial customers to whom Spika distributed "sales brochures."

---

FAC 90-32, dated October 1, 1995, added the current definition of "commercial item" and removed the definition of "general public."

Attached to Agency Counsel's letter were copies of the e-mails Spika sent to three aircraft manufacturers, all three undoubtedly part of the "general public." The e-mails had attached, brochures, which were referred to as "introductory information," and invited the recipients to contact Spika if they desired more information.

FAR 2.101 also defines the term "offer," albeit apparently in government contracts terms; it reads::

> "Offer" means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Response to Invitations for bids (sealed bidding) are offers called "bids" or "sealed bids"; response to requests for proposals (negotiation) are offers called "proposals"; however, responses to requests for quotations (simplified acquisitions) are "quotations," not offers. For unsolicited proposals, see Subpart 15.6.

Looking outside of the FAR to general contract law, PLI would refer the Court to the Restatement (Second) of Contracts:

> §24 OFFER DEFINED
>
> An offer is the manifestation of willingness to enter into a bargain, so made so as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

PLI would first note one similarity between the FAR's definition and that of the Restatement: both require that an "offer" must be a form of communication that would allow the "offeree" to bind the "offeror" by the offeree's unilateral acceptance thereof. Under the-accepted definition of an "offer," Spika's March, 2007 communications to do not qualify. The e-mails make clear that what was being transmitted was "introductory information." Nothing in the brochures attached to the e-mails (see Attachment 7) provided information that would allow a "buyer" to actually purchase a platform (e.g.,

price, payment terms, delivery time).[4] Spika's March, 2007 transmittals of its brochures would more properly be considered "preliminary negotiations," which the Restatement defines as follows:

> 26 PRELIMINARY NEGOTIATIONS
>
> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making if does not intend to conclude a bargain until he has made a further manifestation of assent.

PLI would respectfully submit that Spika's March, 2007 distribution of "sales brochures" did not constitute "offers" to sell the platforms. Spika's offered platforms are not, therefore, "commercial items" under FAR 2.101

PLI would also submit that regardless of whether the platforms offered by Spika are compliant with the FAR's definition of "commercial item," they are not compliant with the minimum performance standard in the performance specification for a "commercial non-developmental item," as that term was interpreted by the ARNGB's contracting personnel (i.e., not the attorneys). PLI would again refer to the question/answer contained in Amendment 002 to the Solicitation:

> The following have been added by full text:

[4] In April of 1998 the Under Secretary of Defense For Acquisition And Technology issued a publication entitled "Buying Commercial & Non-developmental Items: A Handbook." On page 5, the following guidance was provided concerning what is a commercial item:

> Possible indications that an item is commercial—customarily used by the general public—are a com-mercial (sic) sales history, listing in catalogs or brochures, an established price, distributors, and availability to the general public. However, a new offering, with no sales history is also considered a commercial item if it is offered for sale to the general public.

ANSWER TO QUESTIONS

1. "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?" YES

PLI's contention has been since the filing of its original protest that this question/answer makes clear that the ARNGB's interpretation of the requirements of the performance specification ("minimum performance standard;" "commercial, non-developmental item") eliminate proposed platforms that the offeror has not previously built and put into use, such as those proposed by Spika. Since it was eventually established that Spika had never manufactured these types of platforms previously, the Contracting Officer's memorandum confirms that they do not meet the performance specification requirement for a "commercial, non-developmental item," i.e., they are not, "previously supplied items that contain minor modifications," or "an improved version of an existing system."

Additionally, PLI would point out that the argument that Spika's offer of platforms that it has never, in fact, actually built complies with the technical requirements of the performance specification defies logic in terms of the performance specification's reference to the requirement for a "commercial, non-development item" as a "(MPS)", i.e., minimum performance standard. "Minimum performance standards," are defined as, "Mandatory capabilities that are required to be offered in the candidate platform." Is it reasonable to believe that this language was intended to allow an offeror to propose platforms for which offeror that had done little more than send out computer-generated "introductory" information?"

Finally, PLI is compelled to note that what the GAO accepted was after-the-fact argument from ARNGB Counsel. In accepting that argument and denying PLI's protest, the GAO sustained the award even though one of the major factual underpinnings of

that award and in the reevaluation decision, in the minds of the ARNGB contracting personnel was that Spika had offered platforms were simply modified or improved versions of platforms it previously produced and supplied. In the proceedings before the GAO, that belief was shown to have been erroneous. That the attorney can make an argument after-the-fact is not proof that the ARNGB Contracting Officer would have made the same award decision, had she/he known that Spika had never produced these platforms.

## IV. CONCLUSION

Wherefore, for all the foregoing reasons PLI requests that the Court grant its motions and enjoin performance of the contract awarded to Spika by the ARNGB arising from the Solicitation, pending a hearing on PLI's Complaint seeking declaratory and injunctive relief.

Respectfully submitted,

Marc Lamer
Attorney for Precision Lift, Inc.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION LIFT, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. |
| v. | : | |
| | : | JUDGE |
| THE UNITED STATES | : | |
| | : | |
| Defendant. | : | |

DECLARATION OF JOHN TOLLENAERE

I, John Tollenaere, declare under penalty of perjury that following is true and correct, to the best of my knowledge, information and belief.

1. I am the President of Precision Lift, Inc. ("PLI") and I am authorized to make this Declaration on PLI's behalf.

2. PLI has been in operation since May of 1990; it was originally incorporated in the State of Virginia, the Virginia Corporation was dissolved and PLI was then incorporated in the State of Montana in 1999.

3. Since October, 2005 I have been the sole stockholder in PLI, and through me PLI has been certified by SBA as a Viet Nam Era Service Disabled Veteran-Owned Small Business ("SDVOSB"); PLI is also a Small Business Administration certified HUBZone Small Business Concern.

4. In 2001 PLI began working with a Canadian company, West Coast Weld Tech, Inc. ("WCWTI"), which was a manufacturer of helicopter maintenance platforms.

5. In 1998, PLI had been awarded a General Service Administration ("GSA") Federal Supply Schedule ("FSS") contract for Heli-Baskets, i.e., Contract No. GS-07F-

9893H; in 2001, as a result of PLI's new relationship with WCWTI, helicopter maintenance platforms were added to PLI's GSA FSS contract.

6. Because GSA contracts contain a NAFTA clause (FAR 52.225-21 or 52.225-21), the contractor is permitted to supply Canadian manufactured products, as if they were domestic.

7. Subsequently, PLI and WCWTI discussed the establishment of an American manufacturing facility, so as to be able to compete for maintenance platform contracts outside of PLI's FSS contract (i.e., contracts without the NAFTA clause).

8. As a result, in 2005 WCWTI established West Coast Weld Tech International ("WCWT Int'l") at 4101 North Star Blvd., Great Falls Montana.

9. Since 1984, PLI and WCWTI/WCWTI, Int'l have delivered 35 UH-60 helicopter maintenance platforms, 15 CH-47 helicopter maintenance platforms and 7 AH-64 helicopter maintenance platforms to various U.S. Military department, including 6 CH-47, 63 UH-60 and 5 UH-60 (Tail Section) platforms to the Army National Guard Bureau ("ARNGB") under Contract W9133L-05-F-0218 awarded in 2005 ("Contract 0218").

10. In August of 2007, I became aware of a new procurement being conducted by the ARNGB for maintenance platforms for various helicopters.

11. Solicitation W9133L-07-T-0033 ("the Solicitation") was issued by the ARNGB in August 6, 2007; it sought competitive proposals for maintenance platforms for CH-47, UH-60 and AH-64 helicopters. A copy of the Solicitation is attached hereto, incorporated herein and marked Exhibit "A."

12. The Solicitation also included a three page "Performance Specification" (see Exhibit "A" pages 3-5) for "Portable Aircraft Maintenance Platforms."

13. The Performance Specification included, under "Definitions," what were described as "Minimum Performance Standards (MPS)," which were stated to be. "Mandatory capabilities that are required to be offered in the candidate platform," and which, "shall not be traded against other...requirements...." (emphasis in original)

14. According to the Performance Specification, one "Minimum Performance Standard" for the offered platforms was that they be "commercial; non-developmental items."

15. The Solicitation further provided that award would be made on a "best value" basis with three evaluation factors (in descending order of importance): Technical, Past Performance and Price.

16. Per Amendment 001to the Solicitation, the title of the Performance Specification was changed to "Phase Maintenance Platforms." A copy of Amendment 001 is attached hereto, incorporated herein and marked Exhibit "B."

17. In addition to the change in the title of the Performance Specification, there were several changes to the platforms described therein.

18. The original language in the performance specification clearly described a portable or universal type of platform, i.e., a small, easily transportable platform, akin to scaffolding on wheels; for example

a) the platforms had to be towable with a standard aircraft tow-bar

b) the platforms had to fit on a military 463L pallet (88" by 108") when disassembled;

c) the platforms had to provide for "smooth towing," for use on soft, unimproved surfaces and for a level work surface when on an up to 10 degree slope.

19. The revised Performance Specification, per Amendment 001 stated that the platforms were to be "Phase Maintenance Platforms," which are different from simple portable platforms; the term "phase maintenance platform" describes a platform which would encircle the entire helicopter, and one which has multiple, vertically-adjustable decks, multiple access stairs, is able to support safely an entire maintenance team working on different areas of the aircraft simultaneously, is designed for an exact fit to a specific aircraft, and comes equipped with integrated electrical, lighting and pneumatic utilities, essentially creating a fixed work environment around an aircraft.

20. Notwithstanding Amendment 001's change in the items being procured, language remained in the specification that was inconsistent with "phase maintenance platforms," e.g., the requirement for towability, which does not apply to a "phase maintenance platform," and the requirement for use on an up to 10 degree slope.

21. As a result of Amendment 001's apparent change in the type of items being procured, while keeping the same basic description and still requiring that the offered platforms be "commercial, non-developmental item(s)," PLI sent a question to the ARNGB Contracting Officer: "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?"

22. Amendment 002 to the Solicitation was then issued on August 22, 2007 by the ARNGB; it modified the Performance Specification; the requirement for a "commercial, non-developmental item" remained, however. A copy of Amendment 002 is attached hereto incorporated herein and marked Exhibit "C."

23. Amendment 002 also included the following Answer To Questions (i.e., the answer to PLI's question:

1. "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?" YES

24. PLI submitted a timely offer in response to the Solicitation.

25 In its offer, PLI set forth its background, including listings the contracts for helicopter maintenance platforms; in total PLI delivered some 200 units of various types of platforms to the Military. A copy of PLI's Technical Proposal is attached hereto, incorporated herein and marked Exhibit "D."

26. On September 23, 2007, I became aware of a story in a Montana newspaper; in it, Spika Welding & Manufacturing, Inc. ("Spika") announcement that it had been awarded the contract arising from the Solicitation.

27. I immediately called the Contracting Officer and on the day, PLI received a memorandum informing it of the award to Spika; I immediately saw on the memorandum that Spika's price was higher then that which PLI had offered. A copy of the Memorandum is attached hereto, incorporated herein and marked Exhibit "E."

28. I am familiar with Spika, since that firm had been a subcontractor to PLI under Contract 0218 with the ARNGB, a contract which included both helicopter maintenance platforms and trailers; while Spika manufactured the trailers, the maintenance platforms were produced by WCWTI/ WCWT Int'l.

29 As I said above, I am familiar with Spika; while as of the date of offers to the ARNGB it had recently begun to produce simple platforms, it had never manufactured and put into use any "Phase Maintenance Platforms" of the type described in the Performance Specification.

30. Attached hereto as Exhibit "F" are drawings Spika has circulated showing a platform it supplied a military customer in 2007; compare that to Exhibit "G," which are

depictions of PLI platforms that meet the requirements of the Performance Specification.

31. I immediately requested a debriefing from the Contracting Officer, which PLI received on October 1, 2007. A copy of the debriefing letter is attached hereto, incorporated herein and marked Exhibit "H."

32. At that point, PLI filed a protest with the Government Accountability Office ("GAO"). A copy of PLI's protest dated October 4, 2007 is attached hereto incorporated herein and marked Exhibit "I."

33. While I was not privy to the protest documents (due to the GAO's issuance of a Protective Order), PLI's counsel advised me that the ARNGB had responded to the protest, in part, by asserting that Spika had, in fact, produced the very same maintenance platforms as were being procured under the Solicitation, as subcontractor to PLI under Contract 0218.

34 I then signed a sworn declaration, attesting to the fact that under Contract 0218 Spika had only produced the trailers and had never produced any of the maintenance platforms. A copy of my prior declaration is attached hereto incorporated herein and marked Exhibit "J."

35. At that point, PLI was notified by the ARNGB that it would reevaluate the offers, specifically researching the issue of whether Spika had offered "commercial non-developmental items." A copy of the Contracting Officer's November 21, 2007, Memorandum to PLI is attached hereto, incorporated herein and marked Exhibit "K."

36. On March 31, 2008 PLI received via e-mail a letter from the new Contracting Officer confirming the award to Spika. A copy of the letter is attached hereto, incorporated herein and marked Exhibit "L."

37. PLI again requested a debriefing. A copy of PLI'S April 1 letter is attached hereto, incorporated herein and marked Exhibit "M."

38. PLI filed a second GAO protest on April 8, 2008. A copy of the second protest is attached hereto, incorporated herein and marked Exhibit "N."

39. PLI's second protest again argued, among other things, that Spika's platforms did not meet the requirement in the Performance Specification for a "commercial, non-developmental item," because Spika had never previously produced any of the platforms being procured.

40. PLI received a written debriefing on April 11, in which the Contracting Officer asserted (on page 4) that Spika's Platforms met the requirement for a "commercial non-developmental item," because they were commercial items, "with minor modifications from commercial platform designs." A copy of the debriefing letter is attached hereto, incorporated herein and marked Exhibit "O."

41. Ultimately, the GAO denied PLI's protest; while the redacted version of the decision has yet to be released, PLI's counsel has informed me that the GAO ruled that Spika's platforms met the definition of "commercial, non-developmental items" in the FAR 2.101 and thereby the Performance Specification, because while Spika had not, in fact actually sold any such platforms, it had, apparently circulated some sort of marketing brochures to potential customers, and that, according to the GAO, meant they had been "offered for sale" to the general public..

42. I understand one of the factors the Court must take into account when considering whether to issue a Temporary Restraining Order or Preliminary Injunction is the possible harm to the agency, in this instance the ARNGB.

43. I believe the harm to the ARNGB would be minimal at worst if the Court were to stop performances by Spika, because the Solicitation did not contain any required delivery dates for the platforms

Signed under penalty of perjury this 8th day of July, 2008 at Seneca, South Carolina.

John Tollenaere