# KOSTOS AND LAMER, P.C.

Law Offices
1608 Walnut Street, Suite 1300
Philadelphia, Pennsylvania 19103
Telephone: (215) 545-0570
Facsimile No. (215)545-4617
E-MAIL: Kostos_lamer@msn.com

May 16, 2008

**REDACTED VERSION**
**FOR PRECISION LIFT, INC.**

**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN**
**ACCORDANCE WITH GAO**
**PROTECTIVE ORDER**

General Counsel
Government Accountability Office
441 G Street, NW Room 1103
Washington, DC 20548

Attn: Bid Protest Control Unit (John L. Formica, Esq.)

**Re: Protest of Precision Lift, Inc.**
**B-310540.4**

Dear Mr. Formica:

On behalf of the protester, Precision Lift, Inc. ("PLI"), we are herewith responding to the Agency Report in the above-referenced report. Initially, a bit of background is in order.

Solicitation W9133L-07-T-0033 ("the Solicitation") was issued on August 10, 2007 by the National Guard Bureau ("NGB" or "the Agency"). A.R. Tab 4, page 1.[1] The Solicitation sought sealed offers on maintenance platforms for UH-60, CH-47 and AH-64 helicopters. A.R., Tab 7, pages 14-16. The Solicitation indicated that award would be made to the offeror determined to be the "best overall value," considering (1) Technical, (2) Past Performance and (3) Price. A.R. Tab 7 page 6. The Solicitation did not state that the procurement was being conducted as a commercial item acquisition. See FAR Subpart 12. On September 22, 2007 PLI read a story in the news that the award had gone to Spika Welding and Manufacturing, Inc. ("Spika"). After contacting the Agency, PLI learned that the award had been made at a price $78,478.00 higher than that offered by PLI, the previous supplier of the same maintenance platforms to the NGB. PLI immediately filed a protest will the GAO (Docket No. B-310540).

When PLI submitted its initial protest in October of 2007, it challenged whether Spika, had offered products that met the performance specification's requirement for a "commercial non-developmental item." The Agency Report asserted that [redacted]

[1] "A.R." Tab ____, page ____" refers to the Agency Report submitted in conclusion with the current protest.

PLAINTIFF'S EXHIBIT
A

[redacted]; indeed, the former Contracting Officer went so far as to state that [redacted]. See Contracting Officer's Statement, A.R., Tab 2, page 7.[2] PLI challenged that assertion, including a sworn statement from PLI's President, stating that under PLI's previous contract with this Agency, i.e., W91336-05-F-0218 for trailer and maintenance stands, Spika had been the subcontractor for the trailers only. In response to PLI's submission, GAO required the Agency to supplement its report addressing specifically whether Spika had manufactured the platforms previously. At that point, the Agency announced that it would take corrective action, and reevaluate the proposals, including determining whether Spika's platforms met the requirement for commercial, non-developmental item. The Agency concluded that the platforms offered by Spika meet the requirement, and reconfirmed the award. PLI's second protest followed.

In this protest, PLI raised four issues; first; that the platforms offered by Spika did not meet the "mandatory" requirement for "commercial, non-developmental" items, set forth in the Solicitation's performance specification. The second issue was that PLI's Technical Proposal should have received a rating of "Very Good," rather than "Good." The third issue was that the rating of Spika's Past Performance and PLI's the same, i.e., "Low Risk" was unreasonable and not in accordance with the Solicitation's definitions. Finally, PLI challenged the source selection decision as being fatally-flawed, since it was based on the previous three errors..

## A. Spika's Platform Do Not Meet the Requirements Of the Performance Specification

As PLI had previously pointed out, the Solicitation included a performance specification (as opposed to a design specification). In pertinent part, it read as follows:

> PURPOSE: This performance specification establishes the United States (US) Government's technical and performance requirements For the Phase Maintenance Platforms for the UH-60, CH-47, and AH-64.
>
> DEFINITIONS:
>
> MINIMUM PERFORMANCE STANDARDS (MPS) Mandatory capabilities that are required to be offered in the candidate platform. Minimum Performance Standards shall not be traded against other technical or non-technical requirements in the offeror's proposal.
>
> THRESHOLD (T) Capabilities that should be offered in the candidate

[2] The Contracting Officer's statement was apparently based on Spika having listed the PLI contract in its own Past Performance submission. See A.R., Tab 8, page 25.

> platform in order to satisfy the end user's requirement for safety, effectiveness, and suitability of the platform. Threshold capabilities may be traded against other technical and non-technical requirements in the offeror's proposal.

(emphasis in original).

One requirement included in the Performance Specification's section entitled "CONSTRUCTION" stated:

> (MPS) [i.e., Minimum Performance Standard] The phase maintenance platform shall be a commercial, non-developmental item that is compliant with CFR 1910.

(emphasis supplied)(Note 29 CFR 1910 refers to OSHA regulations). This requirement for a non-developmental item was confirmed in Amendment 0002, which included the following question/answer:

> The following have been added by full text:
>
> ANSWER TO QUESTIONS
>
> 1. "Are you [i.e., the Agency] referencing previously designed and in use full wrap around phase/depot level maintenance platforms?
> YES.

A.R., Tab 6, page 2 (emphasis supplied).

The Agency has now concluded that Spika's platforms meet this requirement. That conclusion is based on a letter dated October 15, 2007, apparently submitted by Spika in response to PLI's initial protest.[3] In pertinent part the letter reads:

[redacted]

[redacted]

[3] The Agency refers to the letter as an unsolicited clarification.

[redacted]d.

What is immediately clear is that [redacted]. It does not say, for instance; "[redacted]" Yet, the Agency has taken Spika's statements and carefully inserted the necessary language. Consider:

On page 8 of the Agency Counsel's letter it states:

[redacted]."

A.R., Tab 14 (emphasis supplied). On page 15 of the Agency Counsel letter, it states:

[redacted]

(emphasis supplied). Again on page 15 of Agency Counsel's letter it states:

[redacted]

[redacted]

(emphasis supplied). Finally, on page 17 of Agency Counsel's letter it states:

[redacted]

(emphasis supplied).

The statements of Agency Counsel are based on the Contracting Officer's Statement. Here is how the Contracting Officer describes Spika's October 15 letter:

[redacted]

[redacted]:

[redacted];

[redacted]

[redacted].

A.R., Tab 15, page 4. (emphasis supplied).

PLI would respectfully point out that the artful editing of Spika's letter by Counsel and the Contracting Officer cannot change its contents. Nowhere does Spika say [redacted]. Nowhere does it say that [redacted]. Indeed, were the case such as the Contracting Officer and Agency Counsel describe, all Spika would have had to do in its letter was [redacted].

Moreover, if Spika was offering a "commercial non-developmental" items, as the Agency argues, the October 15 clarification letter makes no sense from another perspective. The letter reads:

[redacted]

[redacted].[4]

It then continues:

[redacted]

[4] Again, the letter does not say, "including Spika"

[redacted].

The paragraph then concludes:

[redacted].

(emphasis supplied). PLI would suggest that if Spika was writing about a product that it had manufactured or that had evolved from a product that it had previously manufactured, the quoted language makes little sense. All that would be required would be something to the effect of "[redacted] ."[5]

A much more plausible interpretation of Spika's letter is that it is arguing that the maintenance platforms, in and of themselves, are commercial items, and that Spika has improved on the designs of previous manufacturers of those commercial items. Of course, the problem with that argument is that if it were the case, there would be no need for the performance specification to make "commercial, non-developmental" item a mandatory requirement.

Finally, if Spika's October 15 letter was intended to convey an extensive background manufacturing the platforms being procured under the Solicitation, then

[5] The Agency's reliance on Spika's October 15 letter begs the question: if the Agency was willing to accept clarification on this issue from Spika, why did it not simply ask Spika to identify where its platforms have been "[redacted]" or "[redacted]?"

Spika's original proposal makes no sense. The Solicitation asked offerors to provide their past performance history of manufacturing items of similar complexity to those being procured. Yet Spika listed only [redacted] ([redacted]) examples. Of the [redacted], only [redacted] ([redacted]) even mention platforms. One of the [redacted] references mentioning platforms is the previously discredited "suggestion" that Spika had manufactured the platforms supplied by PLI under its previous contract with the Agency. The other references listed by Spika are [redacted] and the [redacted]. However, the platforms Spika supplied to the [redacted] and [redacted] were [redacted] that bear no resemblance to the wrap-around platforms being procured under the Solicitation.

Attached hereto at "A" is a July 2007 e-mail sent by Spika's Marketing person concerning the Three (3) platforms Spika had sold to Lockheed Martin. PLI would only ask GAO to compare this sketch to [redacted]. See A.R., Tab 8, pages 12-21. Additionally, attached at "B" are photographs of PLI platforms that are compliant with the Solicitation's performance specification. As is readily apparent, there is no similarity. Nor could anyone suggest with a straight face that the platforms Spika is offering the Agency in this instance represent platforms with only minor modifications to the ones sold to Lockheed Martin.

As to the stands sold by Spika to the Coast Guard, the differences between those and the platforms being purchased under the Solicitation are easily proven by the pricing differential. Attached at "C" is the original FedBizOps announcement for the Coast Guard acquisition, and at "D" is the notice of the award to Spika. As the announcement states (and the past performance evaluation confirms) the Coast Guard purchased TWO (2) sets of platforms, consisting of SIX (6) stands each[6] for a total cost of $200,000 or an average price of $16,666.67 per stand. Compare that figure with Spika's offered pricing for the full wrap-around phase stands being procured under the Solicitation:

| | | |
|---|---|---|
| AH-64 (complete) | $ [redacted] | each |
| UH-60 (complete) | $ [redacted] | each |
| CH-47 (complete) | $[redacted] | each |

A.R., Tab 8, page 27. The pricing begs the question of how an item that costs anywhere from [redacted] ([redacted]) to [redacted] ([redacted]) times as much as another item be considered to be the same as the cheaper item, with only "minor modifications."

An obvious question is begged: if Spika has produced "[redacted]," or "[redacted]," as the Agency contends: why did it not list buyers of "[redacted]" or "[redacted]" as references in its past performance submission

[6] The evaluator (quoting the Coast Guard CWO) "This first set (six stands) has already been delivered. . . ." See A.R., Tab 18, page 1.

instead of [redacted] and the [redacted]? The Solicitation provided for Past performance going back Five (5) Years. If Spika's platforms have been in "[redacted]" or "[redacted]" for "[redacted]," surely some were sold within the past five years. Yet, the only Past Performance references Spika cites for platforms are [redacted], which were sold in June or July of 2007, and the [redacted], to whom Spika had not yet even delivered the platforms at the time of the original contract award. See A.R., Tab 18, page 1 ([redacted]").

PLI would refer to the GAO's decision in Avtron Manufacturing, Inc., B-280758, November 16, 1998, 98-2 CPD ¶ 148. Therein GAO stated that a requirement for a "commercial NDI test stand" would allow an offeror to propose either a "commercial" or a "non-developmental" item. In denying a protest that the awardee had not offered a compliant item, the GAO stated:

> To support its claims that its proposed test stand was market proven with a reliability track record. ACL, as requested by the RFP, provided performance specifications, a commercial specification sheet, a commercial manual, and lists of commercial customers for its CSD/IDG/GEN test stands, including the [DELETED] offered here. Id. at v. 1, § 3, and v.2.

Id. at page 5 (emphasis supplied). PLI would ask that GAO compare its proposal, which included references to its prior sales of the specific platforms being procured, together with drawings, product descriptions, engineering analyses and user guides for each maintenance platform, with Spika's proposal, which included only its "[redacted]" and the two customer references, i.e., [redacted] and the [redacted], for smaller, dissimilar platforms.

At this juncture, the question/answer in Amendment 002 bears revisiting. It reads:

> Are you [i.e., the Agency] referencing previously designed and in use full wrap around phase/depot level maintenance platforms?"
>
> [Answer] Yes.

A.R., Tab 6, page 2 (emphasis supplied). In its protest, PLI contended that this question/answer eliminated Spika's offered platforms. The Contracting Officer's Statement addresses PLI's challenge and offers his explanation as to why Spika's platforms meet this requirement:

[redacted]

[redacted]

A.R., Tab 15, page 3 (emphasis supplied). See also, Tab 19, page 2.

PLI has no argument with the Contracting Officer's interpretation, at least in part. The Contracting Officer states that the Agency intended the language to mean that minor modifications to "previously designed and in use" platforms would be accepted. PLI would point out that the interpretation ignores the phrase "full wrap around" as modifying the term platform. However, Spika's offered platforms, [redacted], cannot reasonably be considered to exhibit only "minor modifications" to its "previously designed and in use" (i.e., [redacted] and the [redacted]) platforms. Moreover, if the modifier "full wrap around" is considered, the argument that Spika's offered platforms represent merely minor modification to previously produced platforms becomes ridiculous.[7]

PLI has previously cited the GAO's decision in Chant Engineering Company, Inc., B-281521, February 22, 1999, 99-1 CPD ¶ 45. Therein the protester challenged its

[7] The Contracting Officer seems to imply that the question answered in Amendment 0002, which had been submitted by PLI, was some sort of carefully worded trap or artifice, intended to trick the Agency into the one-word answer of "Yes." See, A.R., Tab 15, pages 3-4. However, the question was prompted by the Agency's issuance of Amendment 0001 to the Solicitation.

The Solicitation, as originally issued, included a Performance Specification calling for, "Portable Aircraft Maintenance Platforms." See, A.R. Tab 4, page 3. Amendment 0001 then changed the Performance Specification to, "Phase Maintenance Platforms." See, A.R., Tab 5, page 2. This prompted PLI's question, "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms" (emphasis supplied), to which the Agency answered, "Yes."

exclusion from a competition for commercial test stands. In denying the protest, GAO stated:

> Although Chant's proposal showed that Chant had designed and fabricated several other types of test stations/stands for the government, there is no indication in the proposal that these items were ever commercially available and that the test station proposed here has evolved from any of those items through advances in technology or performance and would be available in the commercial marketplace in time to satisfy the delivery requirements of this RFP. See FAR § 52.202-1(c)(2). One of the purposes of a solicitation requirement for a commercial product is to avoid the design and engineering risks associated with new equipment by procuring a commercially proven items. See AUL Instruments, Inc., B-186319, Sept. 1, 1976, 76-2 CPD ¶ 212 at 6. New equipment like Chant's proposed test station,
>
> Which may only become commercially available as a result of the Instant procurement, clearly does not satisfy the RFP requirement for commercial off-the-shelf (existing) equipment. See Aydin Corp., B-224185, Nov. 28, 1986, 86-2 CPD ¶ 625 at 3, aff'd B-224185.2, Feb. 10, 1987, 87-1 CPD ¶ 141, recon. denied, B-224185.3, Aug. 25, 1989, 89-2 CPD ¶ 176; AUL Instruments, Inc. supra.

Id. At page 4. PLI submits that the instant situation is precisely the same as was the case in Chant Engineering. Spika may have previously produced some type of maintenance stands, just as Chant Engineering had previously produced test stands.. However there is no evidence that Spika has ever produced the items being procured in the Solicitation or anything remotely like them. Nor is there any indication that the maintenance platforms it is offering the Agency in this situation have "evolved from" any of the platforms it has produced in the past, "through advances in technology." As such, Spika's platforms do not meet the mandatory requirement of the Performance Specification for a "commercial, non-developmental item."

**B. The Agency Failed To Perform A Proper Analysis In Rating PLI's Proposal Only "Good" Rather Than "Very Good."**

The second element of PLI's protest challenged the rating of "Good" assigned to its Technical Proposal rather than "Very Good." Here is the Contracting Officer's Response:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

A.R. Tab 15, page 5 (emphasis supplied).

First, a review of the difference between "Good" and "Very Good," as spelled out in the Solicitation is in order:

Technical Quality Scale:

| RATING | DESCRIPTION |
|---|---|
| Very Good | Offeror's proposal demonstrates a very good understanding of the requirements and the approach is of good quality. Strengths clearly outbalance any weaknesses that exist. There are no deficiencies. |
| Good | Offeror's proposal demonstrates an acceptable understanding of the requirements and the approach is of good quality. There may be strengths or weaknesses and the strengths balance the weaknesses. No deficiencies exist. |

PLI would now direct GAO to the Technical Evaluation cited by the Contracting Officer as the "objective full technical analysis (Tab 9) that considered all aspects of the offerors' technical proposals." Here is the analysis of Spika's proposal:

> [redacted]
>
> [redacted]
>
> [redacted]
>
> [redacted]
>
> [redacted] A.R. Tab

9, page 1. Next is the evaluation of PLI's Technical Proposal:

> [redacted]
>
> [redacted]
>
> [redacted]
>
> [redacted]

PLI would respectfully submit that this evaluation provides no meaningful analysis, let alone an "[redacted]." It analyzes three (3) proposals on, essentially, one page. It cites no [redacted]. While a two page "check-list" denoting various elements of the offerors' technical proposals measured against the requirements of the Performance Specification is attached to the Evaluation Memorandum, there is virtually nothing in the Memorandum to show how the evaluator used the information in the check-list in arriving at his ratings. Moreover, there is absolutely no explanation for how or why the check-list supports a finding that Spika's Technical Proposal demonstrated a "[redacted]" understanding of the requirements of the performance specification, while PLI's proposal only demonstrated only an "[redacted]" one.

Your office has routinely stated:

> In reviewing protests of alleged improper evaluations and source Selection decisions, it is not our role to reevaluate submissions; Rather, we will examine the record to determine whether the agency's judgment was reasonable and in accord with the stated evaluation criteria and applicable procurement laws and regulations. See Abt Assocs., Inc. B-237060.2 Feb. 26, 1990, 90-1 CPD ¶ 223 at 4. However, for our Office to perform a meaningful review, the record must contain adequate documentation showing the bases for the evaluation conclusions and source selection decision. OSI Collection Servs., Inc, B-286597, B-286597.2, Jan. 17, 2001, 2001 CPD ¶ 18 at 8.

Panacea Consulting, Inc., B-299307.4, B-299308.4, 2007 CPS ¶ 141 at 3-4 (2007). PLI submits that the technical evaluation referenced in the Contracting Officer's Statement (A.R., Tab 9) does not provide any sort of basis for the GAO to review the evaluator's conclusions. Therefore, PLI asserts again that the assignment of a rating of "Good" to its Technical Proposal amounts to a purely arbitrary decision.

**C. The Agency's Assignment Of The Same Past Performance Rating To Spika And PLI Is Unreasonable**

In the March17 reevaluation of the offerors' Past Performance, the evaluator again assigned ratings of "Low Risk" to both Spika and PLI. PLI submits that given the fact that it has previously supplied the very same platforms to the NGB as are being procured under the Solicitation, whereas Spika had never performed in any contracts which could be described as "similar in could be described as "similar in scope and complexity," the assignment of the same rating to Spika as PLI received is unreasonable.

The Solicitation states as follows with respect to Past Performance:

> **Past Performance.** Past Performance on contracts currently ongoing or completed within the last five years that are directly similar in scope and complexity of the performance specifications. Each offeror will be evaluated on its performance under existing and prior contracts for similar products or services. Evaluation will not be based on an absolute standard of performance. The government reserves the right to consider all aspects of an offeror's performance history, but will attribute more significance to recent work comparable in scope to this situation.

A.R. Tab 4, pages 6-7 (emphasis supplied). The Solicitation then provided a "Past Performance Risk Assessment Scale (A.R., Tab 4, page 7).

| ASSESSMENT | ASSESSMENT DESCRIPTION |
|---|---|

| | |
|---|---|
| Low Risk | The past work and experience is mostly high quality and relevant. There is a high probability of success that the offeror should be able to execute the work based upon previous performance. |
| Moderate Risk | The quality and relevance of the past work and experience is mixed. There is moderate probability of success that the offeror will be able to execute the work based upon previous performance. |
| High Risk | The past work and experience is below average to poor quality and/or past work and experience is not particularly relevant. There is a moderate to high probability that the offeror will be unable to execute successfully the work based upon previous performance. |
| Unknown | The past work and experience, if any, is not relevant to the solicitation's objectives and requirements. |

(emphasis supplied).

In evaluating Spika's Past Performance, the evaluator cited [redacted] ([redacted]) of the [redacted] ([redacted]) references included by Spika in its proposal (A.R. Tab 8, page 23): the [redacted] and [redacted]. Taking [redacted] first, the evaluator wrote:

[redacted]:

"[redacted]."

[redacted]

[redacted]

A.R., Tab 18, page 2-3 (emphasis supplied).

With respect to the [redacted] reference, PLI would ask GAO to look again at Attachment A, Spika's drawing of the three (3) platforms sold to Lockheed Martin, and compare them to [redacted] The platforms sold to Lockheed Martin consist of a single platform to be placed next to one side of an aircraft. PLI submits that no technical expertise is required to determine that the stands sold by Spika to Lockheed-Martin are not in any way "[redacted].

As to the [redacted] reference, here is what the evaluator wrote:

[redacted]:

"[redacted].

[redacted]

[redacted]

[redacted]

[redacted].

[redacted]."

[redacted]

A.R., Tab 18, pages 1-2 (emphasis supplied). Once again, the evaluator asserts [redacted].

With respect to the platforms Spika is supplying the Coast Guard and those being procured under the Solicitation, we have previously noted the difference through a review of the prices. See Section A, supra, at pages 7-8. PLI would also direct the GAO to a side-by-side comparison of a platform as described in the Coast Guard combined announcement/solicitation (Attachment "C") , which resulted in the award to Spika (Attachment "D") with one that is complaint with the requirements of the Performance Specification. See Attachment "E." The Coast Guard platforms are built to carry a minimum of two (2) 180 lb people versus a minimum of 1000 lbs for the National Guard platforms. Other specific differences in the requirements for the two platforms include:

- electrical connections ("No" for the Coast Guard, "Yes" for the NGB)

- pneumatic (air) connections (“No” for the Coast Guard, “Yes” for the NGB)
- locking wheels (not required for the Coast Guard, mandatory for the NGB)
- height adjustable (“No” for the Coast Guard, “Yes” for the NGB)
- leveling capacity (“No” for the Coast Guard, “Yes” for the NGB)

Finally, as the PLI comparison (attachment “E”) notes, the B1 (i.e., Coast Guard) stand is not OSHA complaint, requiring the technician to remain on the stand for fall protection. With the full wrap-around phase platform, the technician has fall protection regardless of whether he is on the platform or the aircraft itself.

If one’s definition of “[redacted]” is simply that both platforms are used for aircraft maintenance, then PLI would agree; they are “[redacted].” If however one looks at the features of each and the manufacturing processes required to produce those features, then the assertion that the two types of stands are directly similar would seem to be absurd.

Moreover, PLI would note that Spika [redacted], “[redacted]” See A.R. Tab 18, page 1. That was nearly [redacted] ([redacted]) [redacted].[8]

In conclusion, then, the evaluator found:

[redacted]”

[redacted].

(emphasis supplied). PLI can only state that the evaluator’s assertions are belied by the platforms themselves.

---

8 [redacted]

Finally, PLI would make one other point regarding the Past Performance evaluation. If as the Contracting Officer states, [redacted], one would naturally expert Spika to have listed the customers who received those previously manufactured stands (since the Solicitation followed offerors to go back five years on Past Performance). Yet, the only [redacted], [redacted] stands, rather the "full wrap-around" helicopter stands being procured, and which were only supplied in 2007.

## D. The Source Selection Decision In This Instance was Fatally Flawed

The fourth challenge raised in PLI's protest was that the source selection decision, which was necessarily based on the issues raised in the protest (A, B and C, above), could not be sustained. That remains so. However, even assuming for the sake of argument that the GAO were to decide that Spika's offered platforms were "commercial, non-developmental" items and that the assignment of a Past Performance rating of "Low Risk" for Spika was reasonable, the source selection decision remains fatally flawed.

As discussed above, the three factors to be evaluated in determining the awardee were Technical, Past Performance and Price, in descending order of importance. It is established that PLI's price was lower ($78,278.00), and the Past Performance of the two offerors was rated identically, i.e., Low Risk. That means the award decision necessarily turns on the Technical ratings. Since we have established that the evaluator provided no meaningful explanation for why he assigned Spika's proposal a rating of "Very Good" and PLI's proposal a rating of only "Good," there is no way for the GAO to determine the propriety of the source selection decision. Hence, it is fatally flawed.[9]

## E. Conclusion

For all the foregoing reasons, Precision Lift, Inc. requests that its protest be sustained, that GAO recommend that the Agency terminate the award to Spika and make a new award decision in accordance with the terms of the Solicitation and that it be awarded the cost of pursuing this protest.

Respectfully submitted,

Marc Lamer

ML:jdr
cc: Christine Choi, Esq.
Encl.

---

[9] To the extent this argument varies from the way the protest was framed, PLI requests that GAO consider it a supplemental protest.