# KOSTOS AND LAMER, P.C.

Law Offices
1608 Walnut Street, Suite 1300
Philadelphia, Pennsylvania 19103
Telephone: (215) 545-0570
Facsimile No. (215)545-4617
E-MAIL: Kostos_lamer@msn.com

June 2, 2008

**Redacted Version For**
**Precision Lift, Inc.**

General Counsel
Government Accountability Office
441 G Street, NW Room 1103
Washington, DC 20548

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH GAO PROTECTIVE ORDER**

Attn: Bid Protest Control Unit (John L. Formica, Esq.)

**Re: Protest of Precision Lift, Inc.**
**B-310540.4**

Dear Mr. Formica:

This is in response to the letter from Agency Counsel, dated May 27, 2008, replying to the question posed by the GAO on Friday, May 24: has the awardee, Spika Welding & Manufacturing, Inc. ("Spika"), in fact, produced the subject platforms previously? Since the filing of the original protest last October, Precision Lift, Inc. ("PLI") has steadfastly insisted that Spika has never previously manufactured the subject platforms; the Agency has repeatedly stated that Spika, in this instance, is offering modified versions of platforms it has previously produced. In the May 27 letter, Agency Counsel [redacted] Nevertheless, contends Agency Counsel, Spika's platforms meet the "[m]andatory" (emphasis in original) requirement in the performance specification that an offered platform be a "commercial, non-developmental item," because, according to the My 27 submission, Spika's platforms meet the definition of "commercial item" in FAR 2.101. Specifically, the letter asserts that Spika's platforms are compliant because [redacted]. As PLI will demonstrate, Spika's platforms do not meet that FAR definition, and even if, assuming for the sake of argument, Spika's offered platforms do meet the FAR definition, they still do not meet the performance specification's requirement for a "commercial, non-developmental item."

FAR 2.101 defines "commercial item" as follows (in pertinent part):

"Commercial item" means—

PLAINTIFF'S EXHIBIT B

> (1) Any item, other than real property, that is of a type customarily used by the general public or non-governmental entities for purposes other than governmental purposes, and—
> (i) Has been sold, leased, or licensed to the general public;
> (ii) Has been offered for sale, lease, or license to the general Public;
> (2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

Agency Counsel contends that Spika's platforms meet this definition because [redacted][1] [redacted]

Attached to Agency Counsel's letter at Attachments 7, 8 and 9 are [redacted]:

[redacted]

[1] The FAR does not define "general public." Prior to October 1, 1995, FAR 15.804-3 incorporated the following definition:

> (5) The "general public" is a significant number of buyers other than the Government or affiliates of the offeror; the item involved must not be for Government end use. For the propose of this subsection 15.804.3, items acquired for "Government end use" include items acquired for foreign military sales.

FAC 90-32, dated October 1, 1995, added the current definition of "commercial item" and removed the definition of "general public."

> [redacted].
>
> [redacted] tom@spikawelding.com [redacted]

Attachment 7, page 1 (emphasis supplied).

FAR 2.101 defines the term "offer," albeit apparently in government contracts terms, as:

> "Offer" means a response to a solicitation that, if accepted, would bind the offeror to perform the resultant contract. Response to Invitations for bids (sealed bidding) are offers called "bids" or "sealed bids"; response to requests for proposals (negotiation) are offers called "proposals"; however, responses to requests for quotations (simplified acquisitions) are "quotations," not offers. For unsolicited proposals, see Subpart 15.6.

Looking outside of the FAR to general contract law, PLI would refer the GAO to the Restatement (Second) of Contracts:

> §24 OFFER DEFINED
>
> An offer is the manifestation of willingness to enter into a bargain, so made so as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

PLI would first note one similarity between the FAR;s definition and that of the Restatement: both require that an "offer" must be a form of communication that would allow the "offeree" to bind the "offeror" by the offeree's unilateral acceptance thereof. Under the-accepted definition of an offer in contract law, [redacted]

[redacted][2] would more properly be considered "preliminary negotiations," which the Restatement defines as follows:

> §26 PRELIMINARY NEGOTIATIONS
>
> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making if does not intend to conclude a bargain until he has made a further manifestation of assent.

PLI would respectfully submit that [redacted] did not constitute "offers" to sell the platforms, a point that Agency Counsel appears to impliedly concede.[3] Spika's offered platforms are not, therefore, "commercial items" under FAR 2.101

PLI would also submit that regardless of whether the platforms offered by Spika are compliant with the FAR's definition of "commercial item," they are not compliant with

---

[2] In April of 1998 the Under Secretary of Defense For Acquisition And Technology issued a publication entitled "Buying Commercial & Non-developmental Items: A Handbook." On page 5, the following guidance was provided concerning what is a commercial item:

> Possible indications that an item is commercial—customarily used by the general public—are a com-mercial (sic) sales history, listing in catalogs or brochures, an established price, distributors, and availability to the general public. However, a new offering, with no sales history is also considered a commercial item if it is offered for sale to the general public.

See Attachment hereto, page 2 (emphasis supplied).

[3] Agency Counsel's May 27 letter reads:

> [redacted]

page 5 (emphasis supplied).

the minimum performance standard in the performance specification for a "commercial non-developmental item," as that term is interpreted by the Agency's contracting personnel (i.e., not the attorneys). PLI would again refer to the question/answer contained in Amendment 002:

> The following have been added by full text:
>
> ANSWER TO QUESTIONS
> 1. "Are you referencing previously designed and in use full wrap around phase/depot level maintenance platforms?" YES

PLI's contention has been since the filing of the original protest that this question/answer makes clear that the Agency's interpretation of the requirements of the performance specification ("minimum performance standard;" "commercial, non-developmental item") eliminate proposed platforms that the offeror has not previously built and put into use, such as those proposed by Spika.

Interestingly, Agency Counsel's letter now offers Spika's interpretation of Amendment 002's question and answer:

[redacted]

Agency Counsel May 27, 2008 letter, page 9. Agency Counsel thus argues that the question/answer was never intended to disallow platforms that had never been previously supplied. Incredibly, in advancing this argument, Agency Counsel contradicts both the Contracting Officer and the previous agency counsel.[4]

Included at Tab 19 of the Agency Report is a Memorandum, authored by the Contracting Officer, specifically addressing the commercial Item issue, and discussing the question/answer in Amendment 002. Here is what the Contracting Officer wrote concerning Amendment 002, in its entirety (see page 2):

[redacted]

---

[4] PLI would also point out that, [redacted]. Thus, Agency Counsel is now offering the interpretation of a party that drafted neither the question nor the answer as to the meaning.

[redacted]

(emphasis supplied).[5] As PLI stated in its previous comments on the Agency Report, it is in perfect agreement with the Contracting Officer's interpretation of the question and answer. Since it is now established that Spika has never manufactured these types of platforms previously, the Contracting Officer's memorandum confirms that they do not meet the performance specification requirement for a "commercial, non-developmental item," i.e., they are not, [redacted]

Moreover, contrary to Agency Counsel's assertion that the inclusion in the performance specification of provisions for submission of design drawings allows for an offeror to propose a platform it has never before built (see Agency Report, Tab 5, page 4, "Design Specifications"), the Contracting Officer's interpretation of the Amendment 002 question/answer harmonizes the performance specification's mandatory requirement for a "commercial, non-developmental item" with the provisions providing for an offeror to propose platforms not yet available. An offeror can propose a not- as-yet-built platform, so long as what it is proposing is [redacted]. Agency Report, Tab 19, page 2.[6]

---

[5] In his Statement, i.e., the Agency's formal response to PLI's resubmitted protest (Agency Report, Tab 15), the Contracting Officer reiterated what he wrote in his March 25 Memorandum:

[redacted].

* * *

[redacted]

page 3 (emphasis supplied). The previous Agency Counsel then adopted this interpretation in her May 8 letter also responding to PLI's protest (Agency Report, Tab 14, page 16).

Additionally, PLI would point out that the argument that Spika's offer of platforms that it has never, in fact, actually built comply with the technical requirements of the performance specification defies logic in terms of the performance specification's reference to the requirement for a "commercial, non-development item" as a "(MPS)", i.e., minimum performance standard. "Minimum performance standards," are defined as, "Mandatory capabilities that are required to be offered in the candidate platform." Agency Report, Tab 5, page 2, emphasis in original. Is it reasonable to believe that this language was intended to be met by platforms for which offeror that had done nothing more than [redacted]

Finally, PLI would comment on Agency Counsel's argument that PLI's interpretation of the question/answer is an attempt to raise a barrier to competition. PLI did not issue the solicitation with its performance specification containing a mandatory requirement for a "commercial, non-developmental item." PLI did not interpret the question/answer in a way that now eliminates Spika's platforms; the Contracting Officer did.[7] As to limiting competition your office has previously sustained protests against awards where the solicitation required a non-developmental item and the awardee's proposal failed to demonstrate compliance, even where only one offeror remained eligible. See, e.g., Trimble Navigation, Ltd., B-271882, August 26, 1996, 96-2 CPD ¶102. PLI would also note that Spika and the Agency have asserted from the beginning of these proceedings that, "As many as 10 different companies. . . have manufactured versions of these platforms." See, Agency Report, Tab 16; Tab 6, page 2.

In conclusion, PLI is compelled to note that what we are now dealing with is after-the-fact argument from Agency Counsel. The argument necessarily asks that GAO sustain the award, when one of the major factual underpinnings of that award and the reevaluation decision, namely that Spika's offered platforms are [redacted], has now been proven to be erroneous.

Sincerely

Marc Lamer

ML:jdr
Cc: Raymond Saunders, Esq. w/encl.

---

[6] Which begs the question: Since Spika has not actually built the platforms previously, [redacted] See Agency Report, Tab 6, page 4 versus Tab 8, page 11.

[7] Unless, of course, the Agency's interpretation of the question/answer is designed to "evolve" as necessary in order to allow for acceptance of Spika's platforms.